[Crim. No. 253. Fifth Dist. Jan. 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR
ARCHIE CLIFTON, Defendant and Appellant.

J. M. Lopes for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney. General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, convicted at a trial by jury of assault with intent to commit rape (Pen. Code, § 220), claims on appeal that the evidence was insufficient to justify

the verdict, and that the trial court erred in its rulings, thus, preventing a fair trial. On the day of the offense, the prosecutrix, Connie Goss, 18 years old, rode some two miles on her bicycle from her mother's home to the residence of a Mrs. Wells, which was located on Road 168 near a bridge which crossed the St. John's River. She had agreed to water a lawn and growing plants at Mrs. Wells' home while the latter was on vacation. After turning on the sprinklers, Connie put on her bathing suit and went to the river, a short distance west of the bridge, where there was a small, sandy beach. No one was there when she arrived, except several small boys, who later left. After swimming, she lay on a towel brought by her for the purpose of sunbathing. At about 4 o'clock, she decided to leave and stood up and shook the sand from her towel. As she was walking toward the bank, she saw a man approaching her with big steps; he looked unusual "like he was bald-headed and his neck was all messed up." Later, she found that the strange appearance resulted from the fact that he had pulled a nylon stocking over his head. Connie, severely frightened by the man's actions and appearance, turned and ran, but the man swiftly followed her, caught her from behind, putting one hand over her mouth and the other behind her neck, and forced her to the ground. In the process, Connie cut her lip and scratched her knee, but she yelled for help and stopped only when the man told her to shut up; he also asked that she go with him under the bridge, which was about 40 feet away. She said, "okay," stating on the witness stand that she only agreed because appellant was on top of her and had her pinned to the ground, and she thought if she could fight for time and get her hands loose, she might be able to run away.

When the man and girl began to get up, they noticed an automobile pulling off the road at the south end of the bridge; appellant immediately let go of her and started running toward an area under the bridge, while Connie yelled again for help and ran toward the automobile. The car proved to be that of Stanley Miller, a contractor residing in the area; Connie got into the Miller automobile, and they backed onto the bridge.

Notwithstanding the improvised mask consisting of the nylon stocking, which was worn by the assailant, Connie and Mr. Miller had a good opportunity to observe the man involved and to identify him as the appellant. When he had first approached Connie on the beach, she looked directly at

him, and she also saw him run after his attack. The stocking mask did change his appearance to some extent, but Connie was able to make out some of his features, seeing that he was tall, of slim build, and that he wore tight-fitting blue bathing trunks. Seated in Mr. Miller's automobile on the bridge, Connie was able to recognize appellant as he ran westerly down the edge of the stream, and while he was trying to get up the brush-filled bank. At that time, he had discarded his nylon stocking mask, and she, therefore, could see part of his face. She noticed that his hair was long and blond.

Mr. Miller also saw appellant running along the river's edge. His car being equipped with a telephone, he called the local authorities in the nearby city of Exeter. In about 15 minutes, a deputy sheriff arrived at the scene and came to the Miller automobile where the peace officer was told what had happened. While Miller had awaited the coming of the officer, he noticed an automobile parked in the brush nearby, and he went closer to it in order to get the license number. After his arrival the deputy sheriff also went to the car and appellant then appeared in the brush nearby, and admitted ownership of the vehicle. The officer and the defendant then went back to the Miller car, where Connie identified him as the attacker, and Miller said he was the man he had seen running away in the river bottom.

The appellant argues that the evidence was insufficient to sustain the verdict. This contention is meritless. On appeal, it is our duty to determine whether there is substantial evidence to support the conclusion of the triers of fact; it is not our burden to inquire whether guilt is established to a moral certainty and beyond a reasonable doubt. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

The crime charged here requires proof that an assault was committed, and that at some time during the assault it was the intention of the defendant to have sexual intercourse with his victim by force. (*People* v. *Nye,* 38 Cal.2d 34 [237 P.2d 1]; *People* v. *Lutes,* 79 Cal.App.2d 233 [179 P.2d 815]; *People* v. *Harshaw,* 71 Cal.App.2d 146, 149 [161 P.2d 978]; *People* v. *Roth,* 228 Cal.App.2d 522 [39 Cal.Rptr. 582]; *People* v. *Peckham,* 232 Cal.App.2d 163 [42 Cal.Rptr. 673].)

It is, of course, always a defense to any accusation of crime

to prove that the prosecution is mistaken as to the identity of the defendant. ■ Such a contention was made in the *instant case*, but as the question of identity is always one for the triers of fact, their verdict stands unless an appellate court can say that there was no substantial evidence to support the conviction. (*People* v. *Alexander*, 92 Cal.App.2d 230, 234 [206 P.2d 657]; *People* v. *Arenas*, 128 Cal.App.2d 594, 600 [275 P.2d 811]; *People* v. *Diaz*, 208 Cal.App.2d 41, 46 [24 Cal.Rptr. 887].)

■ We conclude that there was ample evidence in this case to justify the jury in finding that the person who committed the offense was in fact the defendant. Both Connie Goss and Stanley Miller made a positive identification of the defendant based on ample evidence. ■ That there was an assault of an aggravated character cannot be doubted. The assailant of the prosecutrix grabbed her from behind and placed his hands over her mouth and neck with such force as to cause them both to fall to the ground.

■ The only remaining element necessary to prove the offense was the intent of the defendant to have sexual intercourse by the use of force. (*People* v. *Nye*, *supra*, 38 Cal.2d 34, 37; *People* v. *House*, 157 Cal.App.2d 151, 155 [320 P.2d 542]; *People* v. *Lutes*, *supra*, 79 Cal.App.2d 233, 236.) The two were strangers. The defendant committed an aggravated assault upon the young girl, who wore only a two-piece bathing suit at the time. When he was interrupted in the course of his attack, he ran away, thus indicating consciousness of the commission of an offense; evidence which will be specified more fully in a later part of this opinion indicated that he was obsessed with a desire for sexual intercourse on the afternoon in question.

There is only one thing which might lead a jury, from the argumentative standpoint, to conclude that the defendant did not have the intention to commit rape during the assault, and that is the testimony given by the prosecutrix that, after he had assaulted her and had fallen to the ground with her, he suggested that they go under the bridge, and she then said, "Okay." Connie testified: ". . . then he told me, 'Let's go under the bridge'. . . . I said, 'Okay'. . . . I couldn't fight or do anything. . . . I figured if I could get up and get my hands loose, or anything, I could run. . . . we started getting up and this car pulled in. . . . Well, he let go and he took off running. . . . Back under the bridge. . . . Well, I yelled, 'Help' and went this way around. . . . Mr. Miller was coming there and— . . . I explained to him.''

It will be noted that Connie did not even then purport to give specific consent to sexual intercourse; she only appeared to consent to move under the bridge. She explained as a witness that she said, ''Okay,'' so that she could get up from the position in which she was held prisoner and might have an opportunity to escape. When the opportunity did eventuate, she did escape. If she had gone under the bridge with the defendant, it does not follow that she would have consented to sexual intercourse.

The transcript in this case does not contain the instructions given by the court, and, in such circumstances, we must assume that the jury was correctly and properly instructed. (*People* v. *Danielson,* 203 Cal.App.2d 498, 508 [21 Cal.Rptr. 469] ; *People* v. *Crawford,* 105 Cal.App.2d 530, 537 [234 P.2d 181] ; *People* v. *Winters,* 242 Cal.App.2d 711, 716 [51 Cal.Rptr. 735].) It must have been told that it could not find the defendant guilty of the crime charged unless it found that he had the intent to have sexual intercourse by force at some point during the assault. Aside from the somewhat ambiguous statement of Connie, ''Okay,'' when he suggested going under the bridge, there is ample evidence to show resistance on the part of the prosecutrix, and these factors are important in connection with the issues as to whether the defendant intended to use force and whether she consented. (*People* v. *Newlan,* 173 Cal.App.2d 579, 581 [343 P.2d 618] ; *People* v. *Stewart,* 109 Cal.App.2d 334, 343 [240 P.2d 704] ; *People* v. *Cline,* 117 Cal.App. 181, 184 [3 P.2d 575].) The victim tried to run when she first saw her attacker, but, as already noted, he grabbed her from behind and the two fell to the ground. Then, even though the defendant had his hand over her mouth, she yelled for help and only stopped shouting when he told her to shut up. As soon as she was permitted to stand up, she ran and yelled again for help. When she said, ''Okay,'' at his request to go under the bridge, she was pinned to the ground and unable to get her hands loose, and she only indicated a willingness to go under the bridge in order to get free for a moment, hoping that she could escape. It is clearly indicated in *People* v. *Norrington,* 55 Cal.App. 103, 111 [202 P. 932], that when the victim intends sincere resistance, she should be permitted by the law to rely to some extent on feminine devices in the honest belief that she can best extricate herself from her predicament by fighting for time and remaining relatively calm and collected. We cannot say that the jury did not have ground to find the

presence of all of the elements necessary to constitute the offense.

In view of our conclusion that the jury had ample evidence upon which to convict the defendant, it is clear that the committing magistrate was within his rights in holding the defendant to answer. ■ Evidence necessary to require the defendant to appear in the superior court in response to the charge made by an information need only be a strong suspicion of guilt such as would be held by a reasonable man, and need not be so strong or complete as the evidence necessary to convict a defendant upon trial. (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183-184 [281 P.2d 250]; *People* v. *Nagle*, 25 Cal.2d 216, 222 [153 P.2d 344]; *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 55 [216 P.2d 859]; *Brown* v. *Superior Court*, 234 Cal.App.2d 628, 633 [44 Cal.Rptr. 519]; Witkin, Cal. Criminal Procedure (1963) § 226, p. 212.)

■ The defendant argues that the trial court was guilty of prejudicial error in allowing evidence of an earlier offense on the day of the crime. Mrs. Janet Butler, who lives near Exeter, testified that she answered a knock at her door at about 2 o'clock in the afternoon on the same day as the incident at the riverbank, and that when she answered the door, a male stranger, whom she later identified as the defendant, asked her if she knew of any work in the area; she told him that she did not; he asked, also, if she could tell him the location of a specified person's house, and she did not know; the man then informed her that he was looking for someone with whom to have sexual intercourse, using a gross Anglo-Saxon term. Mrs. Butler closed the door in his face, sought her husband, and they went to the sheriff's office. The incident at the beach occurred around 4 o'clock. The defendant admitted at the trial that he had stopped at the Butler house on the day of the crime; he said the television was blaring and denied that he said anything more to Mrs. Butler than that he was looking for work and seeking to locate the home of another person in the neighborhood. Appellant contends that evidence that the defendant committed an act other than that with which he is charged is not admissible, because it is irrelevant and does not prove any matter in issue. However, in this case, it was necessary that the state prove that the defendant had the specific intent to commit rape at some time during the assault upon the complaining witness. Consequently, defendant's statement to Mrs. Butler was indeed relevant to show an intent to have sexual intercourse. The

Butler evidence, relative to a time about two hours before the incident at the St. John's River, indicated the defendant's state of mind prior to and during the assault. Although the evidence given by Mrs. Butler was damaging to the defendant, it tended to establish a fact material to the prosecution's case, and it could not properly be excluded merely because it might tend to be prejudicial. (*People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924]; *People* v. *Raleigh,* 83 Cal.App.2d 435, 442 [189 P.2d 70]; *People* v. *Brown,* 168 Cal.App.2d 549, 553 [336 P.2d 1].)

Witkin, California Evidence, Second Edition (1966) section 366, page 325, states: "The defendant's motive is frequently relevant in a criminal prosecution, particularly in homicide cases, and it may be shown circumstantially. '[E]vidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit a homicide, and thus to solve a doubt either as to the identity of the slayer, the degree of the offense, the insanity of the accused, or the justification or excusability of his act, is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes.' (*People* v. *Gonzales* (1948) 87 Cal.App.2d 867, 877, 198 P.2d 81; see discussion and listing of cases, 1 Cal. Crimes, § 54; and see *People* v. *Wolff* (1964) 61 C.2d 795, 807, 40 C.R. 271, 394 P.2d 959, infra, § 369.)''

The attempted appeal from the denial of the motion for a new trial is dismissed as nonappealable.

We come, finally, to the question of penalty as administered by the trial court. The court erroneously directed that the defendant be committed to the custody of the sheriff of Tulare County for 180 days. This crime of which the defendant was convicted was a felony punishable by imprisonment in the state prison for not less than one year nor more than 20 years. (Pen. Code, § 220.) The court, apparently acting under a misreading of section 221 of the Penal Code, committed the defendant to the county jail. Section 221 of the Penal Code was amended in 1965 and provides: "Every person who is guilty of an assault, with intent to commit any felony, except an assault with intent to commit murder, *the punishment for which assault is not prescribed by the preceding section,* is punishable by imprisonment in the state prison not exceeding 15 years, or in a county jail not exceeding one year, or by fine not exceeding five hundred dollars ($500), or by both.'' (Italics added.) But the preceding section is section 220 of

the Penal Code and, as we have already seen, it does prescribe a punishment. Therefore, section 221 is not applicable, and the commitment to the custody of the sheriff of Tulare County is erroneous. The trial judge could have accomplished the same result by granting probation to the defendant on condition that he serve 180 days in the custody of the sheriff. We do not know whether probation was denied because the court assumed it could commit the defendant to the custody of the sheriff under section 221 of the Penal Code. In fairness, not only to the defendant but to the trial court, and in furtherance of justice, we direct that the court not only resentence the defendant, but that it preliminarily reconsider the question of probation.

The judgment as to the penalty, including the question of probation, is reversed with directions to the court to reconsider the matter of probation and the penalty and to make new orders relative thereto; the judgment is otherwise affirmed.

Stone, J., and Gargano, J., concurred.