[No. C043236. Third Dist. Nov. 4, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JAYSON ALLEN MAGLAYA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to rule 976.1 of the California Rules of Court, this opinion is certified for publication with the exception of part II of the DISCUSSION.

## COUNSEL

Eleanor Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

1606

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, and Wanda Hill Rouzan, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—In this case we hold that the trial court properly allowed a nonexpert police officer to testify that shoeprints found in the dirt at the scene of a crime were "similar" to the pattern on the soles of defendant's shoes.

Defendant Jayson Allen Maglaya was convicted by a jury of first degree attempted burglary (Pen. Code, §§ 664, 459; further undesignated statutory references are to the Penal Code). Defendant also admitted a prior serious felony and prior prison term. He was sentenced to seven years in state prison. Defendant appeals, claiming the court erred in allowing the lay testimony of a police officer regarding the similarity of footprints found at the scene of the crime to the soles of shoes seized from defendant's residence. He also alleges that misconduct by law enforcement officials deprived him of a fair trial.

In the published portion of the opinion, we reject defendant's attack on the footprint testimony. In the unpublished portion, we reject defendant's other claim of error. We shall therefore affirm the judgment.

### BACKGROUND

At 1:10 a.m. on June 24, 2002, Paul Hogan was sleeping in the living room of his house when he heard a "scraping or a sliding" noise emanating from the closed sliding glass door, which opens onto his back porch. Believing the noise was being made by raccoons, Hogan got up and went to the glass door, over which horizontal blinds had been lowered three-quarters of the way. Below the blinds, he saw the hairy legs of what appeared to be a short, stocky man, and the bottom hem of his long shorts. The intruder wore tennis shoes. When Hogan yelled "hey, what the?" the man took off.

Hogan ran outside and heard the sound of someone going over the fence in his backyard. He then returned to the living room. His wife, who had heard the yelling, was already on the phone to call 911 emergency. Hogan then went to the front of his house where he saw two red taillights of a dark-colored truck. The truck revved up and "pealed [*sic*] out." Hogan recognized the sound of the departing truck as a Toyota pickup, based on his owning two of these vehicles himself.

Within minutes after Hogan's wife's 911 call, Truckee police officers arrived at defendant's house, one to two miles away. They noticed a black Toyota pickup truck parked in front. The hood was warm to the touch.

Defendant, whom the officers estimated to be five feet six inches tall and weigh 165 to 170 pounds, answered the door wearing swim shorts and white socks. He was awake and alert. He had fresh abrasions on his body and a laceration below his knee that was still bleeding. When asked about the injuries, defendant said he hurt himself skateboarding earlier in the day.

One of the officers explained to defendant's mother that they were investigating a burglary and that the description of the suspect and the vehicle used matched defendant "to a T." Defendant became agitated and exclaimed, "This is bullshit, I have been sleeping for two hours." The officer asked defendant if he had been driving his truck, defendant replied, ". . . No, I have been sleeping." When the officers asked defendant why the Toyota pickup was still warm, he stated that he had driven to Reno with a friend and had returned 45 minutes ago. Confronted with the obvious inconsistency between the two stories, defendant became verbally abusive.

In defendant's bedroom, officers found and seized a tank top which was saturated with sweat, a soiled T-shirt, a pair of shorts, and a pair of tennis shoes.

Back at the crime scene, police discovered shoeprints in the dirt of the Hogans' backyard leading from the house to a fence. The top slat of the fence was broken, and there were scuff marks on a tree on the other side. Sergeant Dan Johnston took photographs of the shoeprints and compared them with the shoes seized from defendant's bedroom. The sergeant found "a lot of similarities" between the shoeprints and the shoes, leading him to believe that defendant's shoes "possibly . . . left those prints."

Defendant did not testify. He called a forensic expert, who had also examined defendant's shoes and the photographs of the shoeprints, and could not say one way or the other whether the prints were made by defendant's shoes. Defendant's stepfather testified that defendant sometimes skateboarded and that, when he personally examined the Toyota truck during the officers' visit, it was "barely warm."

## *DISCUSSION*

## I

### *Sergeant Johnston's Shoeprint Testimony*

Prior to trial the court ruled, over defendant's in limine objection, that "assuming appropriate foundations are laid," Sergeant Johnston could give opinion testimony that there were "similarities" between the shoeprints of defendant and the print impressions found at the crime scene. Defendant contends this ruling was erroneous. We disagree.

Evidence Code section 800 provides:

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:

"(a) Rationally based on the perception of the witness; and

"(b) Helpful to a clear understanding of his testimony."

"A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. [Citation.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 153 [121 Cal.Rptr.2d 106, 47 P.3d 988].) 

Here, Sergeant Johnston's comparison of shoes and footprints was rationally based on the witness's perception. In the words of the California Supreme Court, albeit in dicta, "shoeprints are so large and the points of similarity so obvious, the comparison . . . is a matter of *nonexpert rather than of expert testimony.*" (*People v. Taylor* (1935) 4 Cal.2d 495, 497 [50 P.2d 796], italics added.)

The officer's opinion was also helpful to a clear understanding of his testimony, since the jury would otherwise have to make its own tedious comparison of shoes and prints.

In granting the prosecution permission to elicit Sergeant Johnston's lay opinion, the trial court cited *People v. Lucero* (1998) 64 Cal.App.4th 1107 [75 Cal.Rptr.2d 806] (*Lucero*). In *Lucero,* a police officer was allowed to testify that he compared the soles of the shoes the defendant was wearing when he

was arrested with the shoeprint on the counter at the crime scene and that, in his opinion, they appeared to be the same. (*Id.* at p. 1110.) Apparently concluding the testimony was proper, the appellate court noted that courts in other states that have considered the issue have upheld the admissibility of lay opinion testimony comparing shoes and shoeprints. It stated, "Furthermore, even if the testimony should have been excluded, the error was harmless . . . ." (*Id.* at p. 1111.)

Defendant nevertheless claims error in the admission of Sergeant Johnston's opinion concerning the shoeprints. He claims the ruling was contrary to an earlier case not cited by *Lucero*, i.e., *People v. Zismer* (1969) 275 Cal.App.2d 660 [80 Cal.Rptr. 184] (*Zismer*). *Zismer* held that it was error to admit photographs of the shoeprints found at the crime scene without some foundational evidence permitting the inference that they corresponded to defendant's shoes. (*Id.* at pp. 665, 668.)

*Zismer* does not conflict with *Lucero*. The error identified in *Zismer* was the lack of a proper evidentiary *foundation*. The court held the prosecution could not simply place the shoeprint photographs and shoes in evidence in front of the jury without a foundational showing that there was some similarity or correspondence between the two. While there are statements in *Zismer* which, taken in isolation, might suggest that only an expert could provide such a foundation, that clearly is not the holding, as indicated by the court's statement that "footprint evidence is inadmissible without either expert *or lay testimony* connecting the tracks with shoes worn by the defendant . . . ." (*Zismer, supra,* 275 Cal.App.2d 660, 667, italics added.)

■ The admission of Sergeant Johnston's lay opinion did not run afoul of *Zismer*. The officer examined both the shoes and the photographs, which he had taken himself. He testified as to the similarities in the tread patterns generally and ridge lines specifically. He also noted the size of the shoeprints corresponded with the size of defendant's tennis shoes. In sum, the evidentiary foundation that was missing in *Zismer* was provided in the case at bar.

■ In this case, the officer did not testify that defendant's shoes made the prints at the scene of the crime. (See *People v. Taylor, supra,* 4 Cal.2d 495, 497 [suggesting such testimony would be improper].) Rather, he simply compared the tread on defendant's shoes with the prints in the dirt and testified they were "similar." This testimony was well within the competence of a lay witness and was helpful to a clear understanding of the officer's testimony. Consequently, the trial court did not abuse its broad discretion in permitting Sergeant Johnston's lay opinion testimony. (See Evid. Code, § 800; *People v. Farnam, supra,* 28 Cal.4th 107, 153–154.)

## II[*]

### *Law Enforcement Misconduct*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Davis, J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied January, 22, 2004.

---

[*]See footnote, *ante*, page 1604.